Good morning. May it please the court? My name is Kate Schwartz. I'm here today on behalf of the Plaintiff Appellants. I would like to reserve two minutes of my time for rebuttal, please. You can try. Your Honors, this case, which is before you now for the second time, is a case involving dramatic state overreach by the Arizona Attorney General's Office, which executed six mass seizure warrants that were utterly devoid of the individualized suspicion required to establish probable cause. I'd like to begin at the outset of discussing the Fourth Amendment qualified immunity issue in this case by emphasizing that the contested constitutional question here is not whether individualized suspicion was required, but rather whether the challenged warrants satisfied the individualized suspicion requirement. In other words, although the Supreme Court has recognized some narrow exceptions to the Fourth Amendment's main rule requiring an individualized suspicion of wrongdoing, the defendants do not take the position in their brief that any of those exceptions are applicable here, and correctly so. None of them do apply. So bearing that in mind, the reason— They can't, right? I'm sorry? They really sort of can't because none of them were directed at known individual people. That's correct, Your Honor. And so the question here is whether individualized suspicion was satisfied by these warrants, and they were not because of the fact that each of these warrants was premised entirely on profile evidence. These warrants authorized the wholesale seizure of what ended up amounting to thousands of fund transfers and millions of dollars simply because each transfer matched innocent general criteria that was deemed significant by the Attorney General's office based on past investigations of suspected drug and human smugglers. Counsel, are the funds here seized on the grounds that the funds were guilty? Is this one of those kinds of forfeiture cases? Yes, that's correct, Your Honor. Okay, so we don't really have to think about then individualized guilt of any particular person. We have to focus on the guilt of the funds, so to speak. That is, that these funds were being used in illegal transfers. That's correct, Your Honor, but there still needs to be individualized suspicion with respect to each individual fund transfer, individualized suspicion that each transfer was guilty, and that is exactly what was lacking here. When the warrants were executed... I mean, they came up about 90%, right? Isn't that pretty good? That's better than most warrants come up with, huh? Well, Your Honor, first off, when we talk about the statistics... I'm sorry. I was going to focus first on the number. Do you agree with the number? Well, the number varied with each different... It's close. It's something like that. You don't dispute that? I don't dispute that the number that was claimed by the defendants was in the 90%, that there was a 90% likelihood of illegality, but the plaintiffs do contest the validity of the statistics. It wasn't just likelihood. If we accept their evidence, it is that when they executed the warrant 90% of the time, the money turned out to be guilty. That's correct, Your Honor. They were saying that... I mean, that wasn't phrased as a question, but it really was a question. Do you disagree with that? No. They were claiming that in the past, 90% of the time, the funds were guilty. But the reason we contest the validity, and this is very important, is because the Attorney General's Office treated these funds as though they were guilty automatically for matching a profile unless and until they were proved innocent by the purported suspect, in this case, the sender or intended receiver of the funds. So there was a call center, a release program required by these warrants, which was a call center staffed by law enforcement officers. And individualized facts were only collected and individualized assessments were only made after the seizures were already carried out, and then only if the intended receiver or the sender contacted the call center. And then the onus was on the sender or the receiver to persuade the law enforcement officer, in their unbridled discretion, that the purpose of their funds was for an innocent reason. Looking at one of the named plaintiffs in this case, Javier Torres, drives home why this is so problematic, Your Honors. Mr. Torres called the call center and explained to the law enforcement officers that the purpose of his fund transfer to Ms. Vazquez was to repay her for a car that he had sold on her behalf when she moved from Illinois to Arizona. Now, later in the course of this litigation, Mr. I'm sorry, remind me, where was Mr. Torres? Mr. Torres was in Illinois. Mr. Torres was in Illinois. How did Arizona get involved? Ms. Vazquez moved from Illinois to Arizona and left a car for him to sell on her behalf. I see. So he sends the money to her in Arizona. Exactly. And then the funds get seized. He calls the call center and says, look, the purpose of my transfer was to repay an old friend for this car. The law enforcement officers were not persuaded by that, and his funds were deemed criminal and forfeited. Now, later, Mr. Torres and Ms. Vazquez testified under oath in their depositions. Ms. Vazquez corroborated Mr. Torres. The same explanation was provided, this perfectly lawful explanation. And yet today, 11 years after Mr. Torres's funds were seized, the defendants still cannot point to a single fact indicating that Mr. Torres sent his funds for the purpose of facilitating drug or human smuggling. But his funds were forfeited, deemed guilty for purposes of these statistical analyses, and his money has still never been returned to him. So as you can see, the statistics that were offered by the defendants are flawed because we only get there if we accept the fact that these warrants operated not only on a seize first, investigate later basis, but on a basis that put the burden on the individual to prove their innocence, which flips the government's Fourth Amendment burden on its head. It is, of course, the government's burden before invading on its own. Let's play this out into the more usual situation. Let's say the police develop power cards that somebody's car has been used in a drug transaction. Just normal investigation. So they get a warrant to seize the car and have it forfeited, seek to have it forfeited, right? How is that any different? I mean, you know, the person comes in, has to make a case. I think we've lost Judge Bybee. I'm going to stop my question. No, he's back. Judge Bybee? I'm back. You're back. So just a normal transaction with individualized suspicion and they initiate a forfeiture proceeding. Doesn't the same thing happen? Well, the difference in your hypothetical, Your Honor, is that you're saying there is individualized suspicion. There was no individualized suspicion about these funds here. I understand that. That part I understand. But I'm trying to follow up on what you said. Well, look, he calls out, I mean, all that stuff at the back end, whether any of that makes a difference. And I'm not sure why it makes a difference. Your Honor, it only makes a difference. You're right. It is a side point. It only makes a difference. You were playing to the jury. The reason it's important in the context of this case is because of the fact that these statistics sound very compelling, and I make that point to show only that the statistics themselves are flawed and invalid. But the statistics are actually a red herring because even accepting their validity, they add nothing in the way of individualized suspicion. They only speak to the strength of the criminal profile relied upon as the sole basis for the purported probable cause in this case. And there is no precedent for finding that a probable cause determination may rise or fall on the strength of a criminal profile. All of the law to date holds without qualification that a profile alone is not enough to establish probable cause. This court, in the case of $49,576, said unequivocally that in the Fourth Amendment context, a criminal profile, quote, cannot establish probable cause. And for that reason, it went on to hold that matching a drug courier profile could not establish probable cause to justify forfeiture. Likewise, in the Supreme Court's decision in Florida v. Royer, the Supreme Court refused to accept that every nervous man paying cash for a ticket to New York City under an assumed name and carrying heavy bags of a particular brand may be arrested. Likewise here, Your Honors, every person wiring $500 from Illinois to Arizona during a particular time of year may not have his money seized. Because your time is running short, let's say we get past that point. We agree with you there was a Fourth Amendment violation. What do you make of Messerschmitt and the argument about immunity? Your Honor, the defendants would like this court to ignore the fact that they executed pure profile warrants and grant them qualified immunity because of the fact that judges issued these warrants. Now, there is no question that after Messerschmitt, the fact that judges issued these warrants is a significant factor in the objective reasonableness inquiry. But the Messerschmitt court made it clear that the judicial issuance of a warrant does not end the inquiry into objective reasonableness. What's the relationship between the people that are being sued and the people who had the warrants prepared? The people who are being sued. So Mr. Holmes was the head of the Financial Remedies Division of the Attorney General's office. He actually executed the warrant. So he prepared the warrant. So the argument is that if he prepared it, he has immunity because the magistrate authorized it? Your Honor, the qualified immunity inquiry here, because of this court's prior remand, is focused only on the execution, the service and execution of the warrants. But yes, Mr. — But if he's accused of executing it? Because he executed it. But he also prepared it. Yes, that's correct. He didn't — So he's saying that because the magistrate found it a valid one, then I'm shielded because I fooled the magistrate? The defendant's — No, I understand how it works with an officer who's handed a warrant, and he has a right to rely on the magistrate. But are there cases which say the person who prepared the affidavits can then rely on the magistrate? Well, I believe, first of all, that there is an objective reasonableness test here. So the fact that they weren't officers is not actually applicable. And I don't think we can focus on the fact that they prepared it because absolute immunity, I believe, was granted with respect to that particular action previously by this court. Okay, well, if I were you, I might get one vote that way. But it is certainly true that they prepared and executed the warrants. And I think the important thing — Well, I'm not sure you need to rely on it as the basis for liability. But, you know, the difference is that if you have the person who prepares the warrant application execute it, then that person will be charged with knowing what's in it. It's a fairly long — whereas if you took this warrant, it was like a fairly long piece, 70 pages, including the application. Actually, if I could just interrupt briefly, I want to clarify that the actual warrants themselves were not that lengthy. The affidavits certainly were. But if you look at the warrants themselves, if you just took the warrant, you tore up the affidavit, and you hand it to an officer, even a well-trained officer who spends nights and weekends reading Ninth Circuit law, he wouldn't be able to tell that there was anything wrong with it, right? Your Honor, I would argue that somebody simply who went to execute this warrant could tell on the face of the warrant. Well, let's talk about it. Absolutely. What is it on the face of the warrant that — The final page of the warrant, and, Your Honor, if you're looking to the record, page 162 is the page I would direct this Court to, which is the appendix to Sweep 18. This is Appellant's Excellency, Volume 1? 162 is — so Sweep 18. You know, I just want to tell you, you're running — I mean, we're sitting here through the bottle, but none of us are too busy this morning, so — Yes. I will just briefly conclude by answering this question and explaining that on the final page — I'm sorry, 162? Yes. So that is where the warrant lays out what it is that's authorized for seizure. ER 162 says Appendix 1, is that it? Yes. And it sets forth that all transfers over $500 from any person in any of 12 different states to any person in Arizona has that there's — it purports to have a probable cause for every single one of those transfers. No post-parsing is needed to understand that it would — I'm sorry. Just walk me through this. This is Appendix 1 to what? That is the appendix to the Sweep 18 warrant. So that is the warrant that is responsible for the seizure of Mr. Torres's funds. I see. So if you were — if this were handed to an officer who didn't have any — any law enforcement officer can execute a warrant, right? Yes. Okay, so if you handed somebody the warrant, what they would get is the thing that starts on page 157. It says Seizure Warrant and includes Appendix 1. Yes, that's the final page. That's incorporated by reference somewhere in the warrant? It's the final page of the actual warrant itself, and, yes, it is referred to in the warrant. Okay. And so that's what sets forth what is authorized for seizure. And it's — I'm sorry. So what you're saying is a reasonable officer who knows the law would look at this and deduce — and say what? And would say that it is — would understand that there's no way that the attorney — in 12 states to Arizona over the course of however many weeks the warrant was filed. I see. So you're saying this would be — it would be obvious to a reasonable officer that this had to have been based on profiling. And that there was no individualized submission. In violation of — Mr. Schwartz, wouldn't a reasonable officer perhaps looking at this and then looking at the warrant say, well, I don't — I'm not exactly sure I see the justification for this, and then just simply be on a duty to look through the affidavits and everything that was in support of this? In which case there's a lot of material, including a lot of statistical studies, telling him precisely why there is a high probability that he's going to come across illegal funds. Your Honor, the warrant affidavits certainly are voluminous. There's no contesting that. But even glancing through these warrant affidavits, it's quite evident that all of the statistical veerments come from profile evidence. The warrant affidavits talk about trends that are identified with respect to drug and human smugglers and explain the basis for the criteria. Ultimately, the information in the warrant affidavits and all of the information in the defendant's briefs here speaks only, again, to the strength of the profile. It does not speak — What — doesn't Messerschmitt tell us that our responsibility is to find that no reasonable jurist would have approved the warrant? Yes. This court, if — Okay. And in this case, we have multiple jurists in Arizona who approved this at the superior court level, and we have a panel of three judges of the Arizona Court of Appeals who also approved this program or similar programs in Arizona. Your Honor, the reasonableness — I mean, can you just — first of all, before you give me your explanation, can you just answer and make sure that I'm correct in the factual hypothesis that I gave you? Yes. The factual predicate. There are — we have a number of judges. I want to say it's maybe four or five judges at least in the superior court in Arizona who approved warrants similar to this. We have a three-judge panel of the Arizona Court of Appeals. That's correct, Your Honor. The Arizona Court of Appeals did with respect to — Okay. And we would have to find — we would have to declare that all of those jurists were — behaved unreasonably in reviewing this program. No, Your Honor. I would disagree with you there. I think that this court would be finding that the specific judges who authorized the warrants and that the defendants themselves acted objectively unreasonably, but that is — the qualified immunity inquiry never looks to decisions that occurred after the point at which, in this case, the warrants were executed because the qualified immunity inquiry is focused on what the defendants knew was the clearly established law at the time. And so I think to point to the Arizona Appellate Court's decision, which was wrongly decided, but that shouldn't factor into this court's decision. Let me follow up on that question. So there's Ninth Circuit law that says profiling is not enough. Correct. Some brilliant opinions, I think. I agree. And let's say Arizona, of course, Arizona judges are not bound by our — I mean, it's bound by Supreme Court, but not by Ninth Circuit law. So let's say Arizona judges look at the same issue and say there's nothing wrong with profiling. We think it's okay. So where does that put us in terms of a reasonable officer? I mean, you know, the state judges are going along having a disagreement with us as to the proper interpretation of the Fourth Amendment. Well — So when they — when you now bring this lawsuit in federal court in deciding reasonableness or deciding whether it's a violation or whether the judges reason, do we look to Ninth Circuit Fourth Amendment law or do we look to Arizona Fourth Amendment law? We look to federal law, Your Honor, because we're talking about — It's all federal law, Arizona, but state courts are entitled to interpret federal law as well as — in fact, they're required to interpret federal law. That's correct, Your Honor. I certainly would argue that the Ninth Circuit and, of course, the Supreme Court is the clearly established law that controls here. There's no Supreme Court law saying profiling is not enough. Well, Your Honor, Florida v. Royer doesn't say those words, but it did look at a situation where a profile was offered as the sole purported basis to justify an arrest and said that matching the drug courier profile in that case was not adequate for the arrest. So I think that Florida v. Royer is the clearly established law that carries the day here. And let's say the Arizona judges look at Florida v. Royer and read it differently from the way you read it and perhaps the way we read it. Is an officer then unreasonable in relying on that interpretation of the state judges who issued the warrant and approved it? Well, Your Honor, the defendants haven't pointed to any Illinois decision that was precedent at the time that the warrants were executed. Where does Illinois come from? I'm sorry? I meant Arizona. Oh, I'm sorry. Did I say Illinois? I'm coming from Illinois. I just want to make sure we're on the same page. Yes, I'm sorry. The defendants have not pointed to any Arizona — thank you for correcting me — any Arizona state court decision. Well, there was three judges that Judge Bybee referred to in the court of appeal. Yes, Your Honor, but that decision post-stated all of the seizures in this case. That was in a similar litigation that was brought by Western Union with respect to the Sweet 21 warrant. And so that does not have any basis on the clearly established law at the time that these warrants were executed. I see. So your position is the only law out there on this issue was Ninth Circuit law because the Arizona courts had not yet spoken on it. Correct. And therefore, it was clearly established on it. Right. And I think we'll — you used 22 minutes. I apologize. I think we'll give you rebuttal time anyway, and we'll give the other side equal time. Thank you. I appreciate it. May it please the Court. I'm Dominic Gray, and with Rusty Crandall, I represent the defendant appellees. We are not working on a blank slate today. In fact, far from it. Nine judges have weighed in on this case over the past 11 years, and fully six of them have found that there was probable cause. Judge McNamee below, Judges Keppel and Ishikawa, who issued these warrants, and a unanimous panel of the Arizona Supreme Court in a 30-page opinion that is replete with citations to answer Judge Kaczynski's question from a moment ago, all of them finding probable cause. Not finding that there's some ambiguity. I'd like to go back to my original question. Who is being sued here? Not officers who took the warrant, relied on it, and went out and did something with it. Who is being sued, and what is his relationship to the issuance of the warrant? So it's an attorney in the Attorney General's office and the former AG himself who are sued in their individual capacity. What relationship did they have to the preparation of the affidavits that the warrant was based on? They were involved in the warrant application. The affidavit comes from an officer named Kleinman. Did they have anything to do with the submission of that affidavit? They certainly submitted it. And they didn't review it and prepare it? I'm sure they reviewed it very carefully, for which, by the way, this court gave them absolute immunity. Of course they have immunity. I'm not suggesting that. I'm trying to see whether they are like the ignorant, the innocent cop who's handed the 70-page affidavit and said, Well, look, the magistrate approved it, therefore it must be good. Don't you think the people who actually prepared it and submitted it are in a different position than the innocent cop who's not totally familiar with all Judge Kaczynski's opinions? Several responses to that, Your Honor. No? They're missing out. Several responses to that, though. Well, I think your opponent feels that way. The first one is that this court remanded and the exact instruction is that they would enjoy only the immunity available to a police officer. That's at 1055 in the earlier decision. So we are now the reason we didn't win on absolute immunity across the board last time was that the service and execution function would be treated as if it were merely a police officer performing the task and not an attorney. Additionally, my opinion on the matter, I'm hesitant to say this, but it doesn't matter because in Messerschmitt itself, at page 541, the court explains that Messerschmitt himself submitted that application. So the same officer was involved there as well. So we're on all fours with the precedent from Messerschmitt on the subject of qualified immunity. There are also the cases like Pearson v. Callahan and the Harlow case that explain that it's an objective standard. It doesn't fluctuate based on the attorney being involved. But to take a step back, and Messerschmitt is sort of a game-ending development in this case, but there is individualized reason to be suspicious of these wire transfers. Each and every one of them had probable cause, as those many judges have held so far in this protracted litigation. And the reason is not based on profile. In the Western Union case, there was no jurisdiction in Arizona? That's the Arizona Supreme Court, Your Honor. And they found no in-rem jurisdiction over these. A lot of other Arizona judges have found jurisdiction. Yes, correct. Well, maybe the court's smarter. At least it's more authoritative. I'm not about to comment on that. But the reason that all these judges found probable cause was because of modus operandi evidence. The other side characterizes it as profile evidence, which is a term used usually in the context of human behavior. Because we're talking about property being seized, there are only objective features to property. Property doesn't have shifty eyes and sweaty palms. The only things you can look to for wire transfers are traits like these. So I understand why the other side compares it to profile evidence. I'm sorry. That's just not true, is it? What is that? That's just not true. I mean, you know, most of the time the property is in the possession of people who themselves have committed a crime. Yes. You find them with the drugs in the car. Or you have evidence of the use of the car or whatever the property for shuttling contraband. So it is not the case that you can only look at statistical evidence when it comes to property. In those cases, the human is giving you the probable cause to seize the property. Maybe I misunderstood what you said, but I thought what you said is property doesn't have shaky eyes and sweaty palms. And so you can only look at statistical evidence. I mean, that is just not true. So sometimes people. Is it? Well, I understand Your Honor's question. I think we're making slightly different points, however. Why don't you answer my question and then and then you can make whatever point you make. You're making a point which sounds to me like patently wrong. I do. Do you agree that it was patently wrong? Well, no, but I think I can clarify in a way that will. Why don't you tell me? Why don't you tell me why you think it's not patently wrong? In the case of many wire transfers, you don't have a person that you know anything about. Well, but you make a more general point. This is a warrant pertaining to guilty property. Yes. And with guilty property, you can't have specific facts as to its guilt. I thought is what you were saying. You can only look to statistical matters.  They're just common to many pieces of property. Perhaps that's a better way to say what I'm angling at here, and that's. Well, it was the only part. You can only look at generalized information like that. In fact, there are lots of seizure warrants where you can in fact have very specific information as to particular property. I did not mean to suggest that those warrants don't exist or were somehow problematic. Well, I think what I thought you were suggesting is this is the only way you can seize guilty property, and that is not true. That's certainly false. Yes, certainly not what I meant to suggest because case law is full of examples of seizing guilty property based on the behavior of the individuals who have it. In fact, there are. Why don't you go on with whatever point you were trying to make? I thought you were trying to make. The point I'm making is about modus operandi evidence. Evidence like that that was the basis of these warrants to show that each and every piece of property here had probable cause. We have case law that says you can't base warrants strictly on profile information. You've got to have specific facts. Okay? So I don't understand how you can argue that these warrants comply with that case law. You may think it's wrong. You may say that Arizona courts are not bound by it. We can make lots of arguments like that, but I don't see how you can say that these warrants comply with our case law that deal with profiling information. So this court and others have recognized the role of modus operandi evidence independent of any particular person? Yes, there's no doubt about it. But we have also said you can't base a warrant only on profiling evidence. You have to have specific facts. So lots of cases like that. I think that those, the ones at least that I've seen cited in this case, are specific to searches and seizures of an individual. Many times the seizure of property. What does this make? I'm sorry. Do you remember our case involving $44,000? Do we have that? 44 doesn't ring a bell. There's 42,500 and 49,000. Something like that. Case names are difficult. Let's see. Let's make sure they're all on the same page. 49,576? 49,576? Yeah, that's probably it. Yeah, there we go. 116, 425, 427. Okay? Now, that was a seizure case, right? It was a search and seizure case, yes. There was a man at an airport, and because of his conduct. I'm sorry. Just for the name of it, that was a forfeiture case. It was a forfeiture case. Okay. And it's certainly true that an individual can help to generate probable cause to seize property. But there are many cases, you know, I would call the court's attention to. Okay. In the Fourth Amendment context, however, a drug courier can, at most, provide grounds for reasonable suspicion and cannot establish probable cause, citing lots of cases. Yes. How do you distinguish that? I distinguish that because that involves a search of the individual that then turned up the property. Why does that make a difference? If a profile can't establish probable cause, if a profile of a person can't establish probable cause, how can a profile of money establish probable cause? I think that the standard is different in this respect. Moreover, we're not talking about profile evidence. I'm sorry. You think? What do you mean, you think? You have authority saying probable cause is different when you're dealing with seizure of property? All of these cases come up in that fact pattern, Your Honor. That's my point, that these come up in the context of searching an individual and then seizing his suspect property. I don't know of a case that says it's not allowed for property-only seizure cases. Counsel, let me see if I can come at Judge Kaczynski's question from a little different angle. Let's suppose that Mr. Holmes had gone to the federal magistrate, and the magistrate said, well, before I authorize all of these, I want you to just bring me one. Bring me one example. He said, well, we've got an example of somebody in Illinois who's just transferred $1,000 to Arizona, and here's why we think that this is illegal. He says, do you have any other evidence? No, we don't. It's just that we've got a 90% to 97% level of confidence that this is a coyote-related transfer. Now, does the magistrate sign that warrant for the $1,000? Yes. Yes. And actually, giving this example of imagining one of these being just a one-off was among my projects, because I think that is such a strong illustration of how, if you had... Is your answer that he would sign a warrant that says that every transfer from 29 states or whatever they are? So the judge's question is about whether this establishes probable cause if we had it just as to a certain wire transfer. Yes. Whether that would justify this warrant that would give probable cause for 29 states? Because each and every one of these wire transfers meets that description. It's impossible to say that Judge Bybee's hypothetical... But why isn't that just profile? Why doesn't the magistrate say, counsel, how is this different from somebody in the airport picking up a drug courier profile? I think that each of those cases involving drug courier profiles, where the line is on probable cause is an inexact science, and the various traits that they call profile are not enough to establish probable cause. But that is itself kind of an interesting thing, because in, for example, United States versus $129,772, which we cite extensively in this case, the court identifies eight factors. That was another one of these airport cases. The court identifies eight factors, says five of them are profile and three of them are not. Now, interestingly, one of the three that is not is wrapping the money in fabric softener sheets, and my friends on the other side cite that in their reply brief at page seven as being really decisive, how that's so individualized. That's no different than what we're talking about here. That's just modus operandi evidence, which is exactly what the Arizona Supreme Court explained and cited the Second Circuit case of Marine Midland Bank, which goes through this discussion about if you have officers who establish for the court what modus operandi is like for certain criminals and certain criminal groups, that suffices to create probable cause. It would suffice if the warrant was for a single transfer or if the warrant was for 10 transfers or 100 transfers. That's not material. It is only the guilt of the money that's at issue. I'll just commend one other case to the court. Let me just follow up with it. Is there any case law anywhere that says the standard for probable cause is different when you're talking about searches of people than when you're talking about seizures of property? I'm not sure, but some of the outcomes sort of suggest otherwise. This Court's precedent in U.S. v. I'm sorry. Let me make the question more pointed. Do you know of a case that draws that distinction that you're offering? I do not, no. Okay. So give me what you think is your best case that suggests that distinction based on the outcome. Oh, this Court's decision in United States v. $5,644,520, which is sort of the lynchpin. No sense? No sense. No, no. They weren't fooling around, Judge, which is the lynchpin of the court below's decision. It's at Excerpt 6, I think. And that case is a great one because I'm sorry. What's this, Excerpt Volume 6? Page 6. It's the lower court's decision. Page 6. That case is a great one because it involves a couple of budget rent-a-car agents who go and find one of their missing vehicles, and they find in the trunk, actually after driving the car to go have lunch together, which is kind of funny, $5.6 million. And the police arrive and they promptly seize that money. They know nothing about the owner. Absolutely nothing about the owner. And yet that was a proper seizure. It's not necessary to have some sort of specific tie to Mr. Torres or to a specific crime. All you need is probable cause, something more than mere suspicion to believe that this money is involved in criminal activity. And that case is a great example. The 42,500 case that we cite is a good example. All of these are what persuaded these many, many courts. Well, I'm sorry. This was a rental car, right? Yes. I understand. Why isn't that individualized suspicion? You know, you find $5 million in a rental car. It's just the wrong money at the wrong place at the wrong, you know. Why isn't that individualized suspicion? It's no different than saying that a transfer was a person-to-person Western Union transfer during these 10 days when we know that there's high smuggling for an amount that we know. That's all of the traits that you could line up as to the rental car and its property. You can also do something analogous for these transfers in our case. At the very least, and I feel obliged to discuss the other prong. It's sort of, if you do that, then you reduce everything to a statistical amount. You know, they're outside and they have a, outside the house, and they have a dog that sniffs marijuana. I say, well, you know, it works, you know, he's right 98% of the time, so it's really just a statistic, you know. Or, you know, you hear the wafting order of what some policeman thinks is meth being cooked in the house. And you say, well, you know, he's right 99% of the time. Or you, I mean, there's pretty much everything that becomes a matter of statistics, right? So these various traits, smelling meth, the dollar values between certain corridor states, what matters is not their individual persuasiveness. Or they find a house drawing electricity way beyond what, you know, a house would support. And you say, well, you know, this is, you know, sure, they could have a really strange inside swimming pool with actually heating. Or they have a marijuana grove going in there. Not that that's needed in California anymore. Well, some places still. Some places. Yes, all of these and where the work for judges. No, but the problem is if you take that view, then everything becomes a matter of statistics and profiling. And what I'm saying and what all the courts below have held is when you pile up enough of this evidence, and you have the confluence of what may look innocent on its own or may look guilty on its own for that matter, but you pile up enough of these things, the confluence of all those factors can create probable cause. And that's what six judges have held in this case. You know, I wish you wouldn't tell me how many judges there are who make mistakes. But I'm concerned about this whole sweep of the, you know, what your affidavits prove. I don't know. One of them are about 12 states. Another is 29 states. And are they all the same dates of the year? They're all based on some past period. And at some past year, there was a 10-day period where 18 states did this. It seems to me odd that there are one group of states in one affidavit, another group of states in another affidavit, where anybody who sends money back to a relative is going to have his money seized. What does that tell you, this affidavit that in another year there was a 10-day period which from 12 states, most of the stuff that was sent from those states to Arizona was through Western Union? I mean, I don't know whether Western Union has a competitor anymore, but who else would he send it through if he were trying to wire money? But what does that prove for another year? It's the same dates in the following year and from the same 12 states? I don't know that they were exactly the same dates, Your Honor. The basis for those windows of time, the seasons, for example, was based on information obtained from confidential informants, former victims of human smuggling, and the logs in various stash houses. From that, they developed the warrant strategy in the first place. By the time that Warrant 18, which is the earliest one that's disputed in this case, is executed, there's already a bunch of data from the previous warrants, which just goes into showing how reasonable the suspicion is of this particular property. But I will take just— It really bothers me, and there may be a good answer, but to think that from 29 states or so, anybody who's sending money home to a relative is going to have it seized because there may be some illegitimate activities going on. That's a pretty sweeping idea, and what does it lead to? It's going to lead to national seizures? I don't think that's something that you can say. But we got up to 29 states. That's over a majority. And it's somewhat bothersome that— I know a lot of people do send their money home to their families. That's why they're here. Sure. And to demonstrate somehow that all of these funds that people are sending to Mexico— Well, probable cause doesn't require the state to bat 1,000, and it is a lamentable fact that in all probable cause instances, innocent property is in jeopardy of being seized. In fact, Arizona just passed in our last legislature a very sweeping asset forfeiture reform bill. The state takes it very seriously. It's one of the leading, most protected— Well, I'm sure we'll get that case someday. Maybe so. With little time, the court will— Doesn't it bother you that you could have these 29 states, could have been 35 states, where anybody who wants to send his family money is going to have it forfeited, although he may have a right, if the system works properly, to challenge it and get it back? Judge, I'm convinced by the warrants and affidavits. You may not be, but that only shows that it's not clearly established law. The disagreement with the other courts, if there is any, only shows that it's not clearly established. They issued warrants, and I hate to treat this so quickly, but it's kind of the straightforward part of this case. We can disagree on this, or your honors can disagree with the other judges involved, but this was at the very least a debatable point. The standard that no reasonable officer would have served or executed this warrant is really the end of the question. I enjoy talking about it. I think there was probable cause. If your honor is not sold, however, that's not the test. We are not here on a de novo review of probable cause. No, no. I understand you're moving to the clearly established for qualified immunity. Yes, which is, of course, the issue. Well, it's one of the issues. There are two issues in that respect. We can select one. That's right. We also could determine whether it's a constitutional violation and then say that but there's qualified immunity. We have the option of, or we could just say, well, there's qualified immunity, so we don't care whether Arizona violates the Constitution. That's nothing new. I can tell you 10 judges who have said that. Well, trying to avoid that kind of decision that comments on probable cause is why I've devoted the argument to that point. I respectfully request that the court not reach that issue. What happened to the why wasn't Mr. Torres' $1,000 returned to him? I actually don't know. I don't know the facts of that. I don't know if he has it back or not. I assume not. Well, what happens in a case like that? I mean, part of the back end is, well, they'll trust us. This is fine because people can get their money back. So, you know, it's reasonable. That adds to the reasonableness. But it doesn't sound to me like there's much due process involved in that. Just some police officer at a call center says yes, no. So there would be a forfeiture proceeding as an ordinary course after every seizure. And I don't know what happened in Mr. Torres' particular facts. I'm sure my friend on the other side can enlighten us all. The call center is a red herring. It's an effort by the state to go above and beyond and try to provide a quicker way to get your money back. It's not required. I don't think the court should fault the state of Arizona for endeavoring to try a good government measure to lead to prompt return. The lights indicate how persuasive you are. Yeah, I guess that the intermission is over. So thank you very much. Wait a minute. Follow up on that. So there's a call center, and if the call center doesn't work. Then there's a forfeiture proceeding in the normal course. I mean, nothing is in the absence. Somebody has to bring a forfeiture proceeding. Yes, Mr. Torres would bring the forfeiture proceeding. Oh, he'd have to. Oh, excuse me. No, the state brings it. Excuse me. And how does Mr. Torres participate in that? I mean, it's an in rem action. I'm not totally sure. I know that the other side has waived their due process notice argument in footnote 7 of their opening brief. So I don't think we need to address whether he was given adequate notice. Of the forfeiture proceeding? Of the forfeiture proceeding, yes. Okay, you're now up to 26 minutes. Oh, good grief. I apologize for that, but I think this last point, Your Honor, is not actually before the court. Okay. Thank you. Thank you. Your Honors, I'll try to be brief. I know we've gone way over the time here. My opposing counsel said that probable cause does not require the state to bat 1,000. That is true. But probable cause does require the state to have probable cause that is individualized with respect to the person or place to be searched and the person or thing to be seized. And that is what did not occur in this case. That is clearly established. And my opposing counsel cannot point to any case law that says that a criminal profile is alone sufficient to establish probable cause. I can't speak to what they said is their strongest case regarding $5 million. Counsel, the proposition that you've given us, of course, is a good, solid proposition. But the cases that they're always referring to, it do involve people rather than seizures of property. The property was seized sort of incidentally when it was found on some identifiable person. Usually a drug profile case. What do you do with Marine Midland? Because that seems to me to be the one case in which we do have only evidence about some kinds of transfers of money. Your Honor, the Marine Midland case is actually quite distinguishable. In that case, it's important to point out at the outset that the vast majority of that money was ordered by the court to be returned. And with respect to the money that was found. Right. That's because they'd see something like $6 million, and only $1.7 had been traced to actual bad acts. But the $1.7, it looks like, was traced just through transactions. I don't think that really helped you very much. Well, the narrow amount of funds that were allowed, found probable cause, did have individuating features. It was only with respect to money orders that were in a particular account and that had often been marked with specific markers that were tied to the Colombian drug cartel that probable cause was found with respect to. So there were much more there than a profile. There were specific facts about those money orders in particular. Here, we again are talking, the facts are, the amount of money received. But in Marine Midland, we weren't tying that to any particular person, right? No, Your Honor. You might be able to, you were trying to tie it to a cartel, but. But there was individualized cause with respect to those funds as to why those funds were criminal. The fact that there was a marker on the specific money orders that tied them to a known drug cartel is an individualized fact about the funds. All we know in this case is that the amount of money exceeded $500. It was sent from a so-called corridor state, and it was intended to be received in Arizona or Sonora, New Mexico. That is it. That is all inherently innocent criteria, and that is what distinguishes the case regarding $129,000. The fabric softener is what tipped the scales in that case because wrapping money in fabric softener has no innocent explanation to it. But wiring somebody $500 in Arizona has a million perfectly reasonable explanations for it. I think it's kind of important in closing to just drive home the point as well that the defendants have always acknowledged that purely innocent fund transfers would inevitably be swept up into these sweeps. They have never denied that, and the reason that is the case is because there was no individualized suspicion with respect to each transfer. Going back to your hypothetical previously, Judge Bybee, if there was individualized suspicion, in other words, more than just this completely innocent criteria that amounted to a profile, the defendants would not be able to say that, yes, inevitably, there is going to be lawful fund transfers swept up because we have individualized suspicion with respect to all of them, in which case all of them might be criminal. They couldn't say that here, and I think that really highlights the fact that this was pure profile evidence. We have clearly established law that that's not acceptable to establish probable cause, and so for those reasons we ask this court to reverse the district court's decision and instruct the district court to enter judgment in the plaintiff's favor. Thank you, counsel. Thank you, Your Honor. Thank you all very much. A very interesting argument, very enjoyable. The case will be submitted. The court will stand in recess for the day. All rise. This court for this session stands adjourned.
judges: Reinhardt, Kozinski, Bybee